# Landis's Appeal.

|102  467|
|163  551|

In 1790, A. conveyed certain real estate to trustees " to the only use and behoof of the Mennonite congregation of Colebrookdale township and . . . . for such other pious and charitable uses or purposes as shall be thought proper by a majority of the congregation at large," etc. The congregation, after erecting a church on said premises, associated itself with the other churches of the district in a common conference, whose object was the general government of the church. In 1844, a schism occurred in this conference, occasioned by the attempt of a minority, styling themselves the " new " Mennonites, to introduce various innovations, such as instrumental music, into the life and worship of the church. Upon the secession of this minority from the conference and the organization by them of a new judicatory, a separation occurred in the Cole-

.[Landis's Appeal.]

brookdale congregation, a majority remaining within the jurisdiction of the "old" conference, and a minority giving their adherence to the "new" judicatory. Being non-combatant in principle, both parties agreed to worship in the meeting house on alternate Sabbaths, and continued so to do for twenty-nine years. The "old" church party then proposed to tear down the then existing meeting house and erect a large one. They offered the "new" Mennonites the peaceable use of the latter on alternate Sabbaths as theretofore, provided that no musical instruments or "other objectionable" innovations should be introduced, the "new" congregation to contribute according to their own pleasure to the expenses of re-building. The "new" congregation refused to accept these terms and on the attempted demolition of the building, filed a bill in equity to restrain the "old" congregation from so doing. *Held,*

1. That the "old" congregation represented the legal succession to the original congregation of 1790, and held the legal title.

2. That the use of the church, by the plaintiffs for twenty-nine years was merely permissive, and, constituting them but tenants by sufferance, gave them no title by force of the Statute of Limitations.

·March 2d 1883. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

APPEAL from the Court of Common Pleas of *Berks county :* In equity. Of January term 1883, No. 344.

Bill in equity, by Henry H. Borneman et al., trustees of the Mennonite Congregation at Boyertown, Pa., against Samuel H. Landis et al., trustees and building committee of the same, praying for an injunction to restrain the defendants from demolishing a meeting-house, and from the erection of a new place of worship on said premises, and further praying that the parties litigant be decreed tenants in common of said property.

Before the Master and Examiner (B. Frank Dettra, Esq.), the following facts appeared :

In or about the year 1790, Henry Stauffer and Mary Ann, his wife, granted to Abraham Bechtel and Henry High, their heirs and assigns, an acre of ground in the village of Boyertown, Pa., " In trust, to and for the uses and trusts, interests and purposes hereinafter limited and declared, and to and for no other purpose whatsoever ; that is to say, to the only use and behoof of the religious society or Mennonite congregation of Colebrookdale township aforesaid and the neighborhood, who now or hereafter may worship in the house already erected, or in such house or houses of worship which may be hereafter erected on said lot, to wit: for a burial-ground, for keeping a school and meetings in the house already erected on said lot, and for erecting such other house of worship thereon, or such other pious and charitable uses or purposes as shall be thought proper by a majority of the congregation at large, called together, or as many of the regular members thereof as shall attend on due notice to give their votes in such case."

On the ground thus conveyed, the Mennonite congregation

of Colebrookdale township, or, as it was afterwards called, Boyertown, erected a meeting-house in which, as also in a more commodious edifice erected in its place in 1819, they worshipped for many years. The several Mennonite congregations of Eastern Pennsylvania, of which the Colebrookdale was one, had been associated in a common conference, called from its place of meeting the Franconia Conference, which was composed of clerical and lay delegates from the several congregations, and whose purpose was the general government of the church. In or about the year 1844, a discussion arose in this conference concerning the customs and usages of the Mennonite Church. One party desired to introduce various innovations into their mode of life and method of religious worship, a departure that was signalized by the leader of the movement, a Rev. John Overholtzer, appearing in the conference in a coat of a different cut from the customary garb of the Mennonite persuasion. The discussion of these differences between the two parties, known as the "Old" and "New" Mennonite Church, gave rise to great dissension in the conference, and finally culminated in 1847 in the Overholtzer or "new" party formally withdrawing from the Franconia Conference and organizing a new judicatory. The schism extended from the conference to its component congregations. Of the two preachers at Colebrookdale, one, a Mr. Gehman, sided with the Franconia Conference or "Old" Church, while the other, a Mr. Clemmer, espoused the cause of the Overholtzer party. A separation thus ensued, but both parties, being non-combatant in principle, consented to worship in the meeting-house on alternate Sabbaths, and this peaceful arrangement continued for twenty-nine years.

Under these circumstances, the old congregation, which remained in the Franconia Conference, and which composed a majority of the whole number, concluded to tear down the then existing church edifice, and erect a more commodious structure. In recognition of the long-continued occupancy of the church on alternate Sabbaths by the new congregation, they drew up a paper, in which, after stating their intention of rebuilding, they offered the new party the use of the new church on alternate Sabbaths, as theretofore, but accompanied their offer with a stipulation that "no musical instruments or any other things objectionable to the old congregation" should be introduced. The paper concluded as follows : " The new congregation shall be at liberty to aid in the building and contribute to the liquidation of the costs according to their own free will and pleasure, as they may deem just and proper."

The new congregation refused to accept this stipulation, and, on the attempted demolition of the building, filed this bill in equity, praying as aforesaid.

The Master reported, inter alia, (1) that the withdrawal from the Franconia Conference by the Overholtzer party was an actual separation from the Mennonite faith, and the formation of a new ecclesiastical organization; (2) that such withdrawal by the plaintiffs was an abandonment of all their right and title in the Boyertown church property, and that it belonged exclusively to those who remained in the jurisdiction of the Franconia Conference; (3) that the use of the church at Boyertown was merely permissive and that, therefore, no title arose by reason of any statute of limitations; (4) that plaintiffs are not tenants in common, but merely tenants by sufferance. He therefore reported a decree that the plaintiffs' bill be dismissed with costs. The plaintiffs excepted to these conclusions both of law and fact. The court, after argument, recommitted the case to another Examiner and Master (Frank R. Schell, Esq.), with leave to take further testimony, who reported, inter al.a, that the deed contained no express condition that this congregation should be under the supervision of the Franconia Conference or any other conference of the Mennonite Church; that it is doubtful whether this conference could be called an ecclesiastical judicatory; but assuming that it was, only a radical change of faith and doctrine and not a mere separation from any particular church judicatory, would have the effect to forfeit its rights in the trust; that the changes proposed by the New Mennonites were not such radical changes in faith or doctrine, but were evidences of a progressive spirit, which merited judicial sanction rather than condemnation; that independent of these facts, both parties by their acts and conduct after the division in 1847 are estopped from now disputing the right of either to the common enjoyment of the church property. He therefore recommended that the parties to the bill be decreed to be tenants in common, and that the defendants pay the costs of this proceeding.

Exceptions filed to this report by the defendants were dismissed by the court [HAGENMAN, P. J.], and the report confirmed. The defendants thereupon took this appeal, assigning for error the action of the court in not dismissing the exceptions to the report of the first Master and in dismissing their exceptions to and confirming the report of the second Master.

*A. G. Green,* for the appellants.—The preservation and enforcement of trusts is one of the main objects of a court of equity. This conveyance was made in trust for the use of one congregation, and therefore but one can exercise the powers therein granted. The power to act is given to a majority of the congregation. The appellees, therefore, claiming to be a

[Landis's Appeal.]

distinct congregation, and being confessedly in the minority, are entitled to nothing under the deed of trust. True, the appellees were once a part of the congregation, but on their secession from the Franconia Conference the title vested in the remaining members, who were acting and still act in conformity with church law and usages: Presbyterian Church v. Johnston, 1 W. & S. 9; Means v. Presbyterian Church, 3 W. & S. 303; Trustees v. Sturgeon, 9 Barr 321: App v. Lutheran Congregation, 6 Barr 209; McGinnis v. Watson, 5 Wr. 9; Sutter v. Trustees of First Reformed Church, 6 Wr. 509; Winebrenner v. Colder, 7 Wr. 244; Pine Hill Congregation v. St. Michael's Church, 12 Wr. 20; Schnorr's Appeal, 17 Sm. 138; Roshi's Appeal, 19 Sm. 468; Jones v. Wadsworth, 4 W. N. 514; Henry v. Dietrich, 4 W. N. 487.

To decree that the appellees were tenants in common with equal rights of ownership to the property was, therefore, to pervert, if not to destroy, the trust.

It is contended, however, that the purely permissive use by the appellees of this church property for a period of twenty-nine years raises an inference that it was under such a claim of right, as would give them a title to a tenancy in common by virtue of the statute of limitations. That in point of fact the appellees ever held under an adverse claim, we deny. The evidence disclosed the very reverse. Assuming, however, that it did, time does not run against a trust, having the character of a religious or charitable use, and of which equity alone takes cognizance. In Perry on Trusts, sec. 745, it is held that so long as the relation of trustee and cestui que trust continues, no length of time can bar the rights of a beneficiary, as the rights of a creditor may be barred. Still less will the Statute of Limitations apply to a charitable trust, there being "no limitation against God and religion." And when a corporation held the property of a charity 150 years adversely under a deed of purchase, but with notice of the charitable use, it was decreed that the property should be re-conveyed upon the original trusts: McKissick v. Pickle, 4 H. 148; Pickle v. McKissick, 9 H. 232; Jones et al. v. Wadsworth et al., 4 W. N. C. 514.

*Geo. F. Baer* (with whom was *P. D. Wanner*), for the appellees.—There is neither an express nor implied condition in the grant to the congregation, that it shall remain connected with any particular church judicatory. The withdrawal by the appellees from the jurisdiction could not therefore prejudice their rights under the conveyance. They were guilty of no such radical change in faith and doctrine as worked a forfeiture, but merely of innovations in customs and usages. Independent of this, however, we think there is a well defined distinction

in all cases between congregations in denominations which have a church organization and judicatory, such as the Presbyterian and Episcopalian Churches, and such as are independent or supreme in themselves, as Congregationalists, Universalists, etc. The Mennonite Church is congregational in its government. In the former class, the question always is, has the congregation conformed to the faith, tenets and discipline of the judicatory. In the latter, the question is simply one of choice : Trustees *v.* St. Michael's Church, 12 Wr. 20 ; Presbyterian Congregation *v.* Johnston, 1 W. & S. 9 ; McAuley's Appeal, 27 P. F. S. 397 ; Schnorr's Appeal, 17 P. F. S. 138 ; St. Paul Church Case, 2 W. N. C. 677.

We furthermore contend that where the rights of property are doubtful or may become the subject of dispute, an adjustment by the parties themselves, acquiesced in for many years, or when parties have acted upon a particular construction of their rights for many years, or where, under a claim of right, parties have used property in a particular way for thirty years, courts of law and of equity will hold the parties estopped from questioning or contesting such rights, and will protect and enforce them : Follmer's Appeal, 37 Penn. St. 121; Hagerty *v.* Albright, 32 Penn. St. 274: Syphers *v.* Meighen, 22 Penn. St. 125 ; Carter *v.* Tinicum Fishing Co., 27 P. F. S. 310 ; Chew *v.* Morton, 10 Watts 321.

Mr. Justice GORDON delivered the opinion of the court, April 16th 1883.

We cannot understand why the court rejected the report of the Master who was first appointed to examine this case. It is very full, clear, and impartial in its statement of facts, and, in view of those facts, the conclusion reached seems to us inevitable. These new measure men had not a foot to stand upon, in the way of the maintenance of a bill, legal or equitable. More than half a century before the secession of Overholtzer, and those who adopted his principles, the property in controversy was deeded to the Mennonite congregation of Colebrookdale township, and there is not a circumstance in the case that points to a disproval of the fact that the defendants represent the legal succession of the original congregation of 1790. Not only has the same organization been regularly continued from that time, but as the Master finds, so far back as tradition extends, it has had the same ecclesiastical connection. It may, indeed, be true, that this long connection with the Franconia Conference may not be of any very great importance in the disposition of this case, forasmuch as the Mennonite churches are, in their government, congregational; historically, however, it has some force as an indication of what was the original

Colebrookdale congregation. But passing this question of ecclesiastical connection which, were it material, must at once drive the plaintiffs to the wall, for they make no pretence to a connection with the old conference, we ask, upon what do these new measure people profess to stand ?—Not upon the fact that they are a majority of the congregation, for it is admitted that they are but a minority, hence, according to the organic law of congregationalism, not entitled to the control of the church and its property. Neither do they profess to represent the original Mennonite doctrines, for confessedly they are dissenters. The second Master in his report has said that the primary cause of of the differences between these people had its origin in the cut of the Rev. Mr. Overholtzer's coat. Undoubtedly such was the fact, for this new-fangled coat, when it first made its appearance in the conference, symbolized rebellion ; a change of principles, and it is not the first time that the cut or turning of a coat has signified something of much more importance than was apparent either in its style or texture. In this case it meant a written constitution for one merely traditional ; a revision of the catechism ; a permission to marry outside of the pale of the church ; a permission to institute aggressive proceedings at law, and an allowance of the use of instruments in church music. Now, we do not undertake to say that these are not improvements on the old way of doing things. They may, or may not be so, just as people choose to think about them. But of these matters it is not our business, as it was not the business of the court below, to decide, for they are questions of conscience, and belong to individual judgment.

But we do undertake to say, that these things definitely determine the fact that the plaintiffs do not represent the principles of the old Mennonite congregation of 1790, and that, on the other hand, they do most conclusively prove that the appellees represent but a sect of that congegation. If then, it be so, that these complainants are not the representatives of the original ecclesiastical connection ; if they have not with them a majority of the congregation, and if they do not adhere to the original Mennonite tenets, upon what substantial ground do they ask for a decree?

It is true, that the old congregation, with a generosity that is as rare as it is commendable, permitted the dissenters to use its church building for the purpose of worship on alternate Sabbaths. But as this use was merely permissive, and as the old congregation did not thereby surrender either its possession or right of possession, the plaintiffs, .by their occupancy, have not gained even the inception of a title by force of the statute of limitations.

In this, as in other particulars, we agree with the Master

who prepared the first report ; the possession of the plaintiffs was in subordination to that of the defendants ; they came in under and not adversely to the title of the old congregation, and being thus in privity with that title, they are, as to the church property, but tenants as sufferance : Bannon *v.* Brandon, 10 Ca. 263.

The decree of the court below is now reversed and set aside, and the bill is dismissed at the costs of the appellees.