## Krecker et al., Appellants, *v.* Shirey et al., and Immanuel's Church of the Evangelical Association of Reading.

[Marked to be reported.]

*Church law—Title to property—Equity.*

The title to the church property of a congregation that is divided is in that part of the congregation that is in harmony with its own laws, usages and customs as accepted by the body before the division took place, and who adhere to the regular organization.

In such a case it does not matter that a majority of any given congregation or annual conference is with those who dissent. The power of the majority as well as that of the minority is bound by the discipline, and so are all the tribunals of the church from the lowest to the highest.

Upon the questions arising under the discipline, as upon those arising under the articles of faith, the decisions of the ecclesiastical body are ordinarily final, and they will be respected and enforced by the courts of law; but if such decisions plainly violate the law they profess to administer, or are in conflict with the laws of the land, they will not be followed.

*Meetings of conferences—Appointment of ministers.*

The book of discipline of the Evangelical Association of North America provided for a general conference to meet once in four years, and to be the highest judicial and legislative body in the denomination. The dis-

cipline provided that the bishops should in the first place name the time
and place for the meeting of the general conference. If the bishops did
not act, the general conference itself might fix the time and place of meet-
ing. If neither the bishops nor the general conference acted, the oldest
annual conference was to discharge the duty. At an annual meeting of
the general conference, no place having been suggested for the next meet-
ing, the bishops and the conference authorized the board of publication
to receive offers of entertainment after the adjournment, and to decide
upon the place for the next meeting. The board subsequently designated
Indianapolis as the place of meeting. Several months later the oldest
annual conference designated Philadelphia as the place of meeting. The
Indianapolis conference was attended by a very large majority of the dele-
gates from the annual conferences. *Held*, (1) that the selection of a place
of meeting was not a matter of legislation, but of administration, which
could be delegated to the board of publication; (2) that the Indianapolis
conference was the legally constituted conference, and its acts were bind-
ing upon the denomination; (3) that the adherents of the Philadelphia
conference by their own acts put themselves outside of the denomination;
(4) that a congregation of the denomination was bound to receive a min-
ister appointed by the authorities acting in accord with the Indianapolis
conference, rather than a minister appointed under the Philadelphia con-
ference.

*Church law—Ecclesiastical trials—Conferences—Ministers.*

The subordinate trial conference of a religious denomination tried and
sentenced the bishops of the denomination, notwithstanding that they had
been tried and acquitted before on the same charges. The bishops refused
to acquiesce in the sentence of suspension, and continued to perform their
episcopal duties. The general conference subsequently reversed the pro-
ceedings of the trial conference, and indorsed the conduct of the bishops
in disregarding the sentences imposed upon them. *Held*, that as the action
of the general conference did not violate any law of the church, or the law
of the land, it was conclusive, and could not be reversed by the civil courts.

In the above case one of the bishops who had been suspended and the
minority of a local conference organized a new local conference. The
book of discipline provided for the creation of local conferences in a par-
ticular manner by the general conference. The irregular local conference
organized by the bishop assigned plaintiff to a church in the conference.
The general conference which subsequently met, ratified the action of the
bishop, and declared the conference which he had organized, the only legal
conference of the district. *Held* (1) that the action of the bishop and his
adherents was ineffectual to create a legal conference, and that the au-
thority of the body which he organized was provisional only for the relig-
ious care of its members until the general conference could meet; (2) that
the general conference exceeded its powers in declaring the minority body
a lawful and regular conference of the denomination; (3) that the act of
the minority conference in assigning plaintiff to a church was a provisional
act, capable of ratification and adoption by the general conference; (4) that

the ratification of the assignment by the general conference gave plaintiff a title good under the law of the church, and therefore good under the law of the land.

Argued March 2, 1894.    Appeal, No. 168, July T., 1893, by plaintiff, from decree of C. P. Berks Co., Equity Docket No. 544, 1891.    Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ.    Reversed.

Bill in equity to restrain defendants from excluding Augustus Krecker from the position of pastor of the Immanuel's Church of the Evangelical Association of the City of Reading.

The bill alleged the existence, for upwards of ninety years, in the United States of America and in certain foreign countries, of an unincorporated religious association of Christians, known as the Evangelical Association of North America, governed by a fundamental law known as the discipline, establishing a system of graded ecclesiastical, executive, legislative and judicial bodies and officers, under which each local society or congregation is a subordinate member of the general organization.

That under the said fundamental law or discipline the countries in which the said association exists are divided into 25 annual conference districts, embracing fifteen states of the Union, Canada, Germany and Switzerland; that the said conferences are, each of them, deliberative bodies, meeting annually, composed of all the itinerant preachers of the denomination, and those who have traveled and by ordination stand in full connection with the ministry of the association, each of the said conferences comprising many organized churches, some of which are incorporated, and all of the said conferences are subordinate to the general conference.

That under the fundamental law or discipline there is a quadrennial conference of the whole association, composed of one member for every fourteen or surplus of more than seven members of each annual conference, who are elected from among the elders by a majority of members of the said annual conference, and also certain officers of the association, including the bishops, the said quadrennial conference being known as the general conference, and constituted, by the fundamental law, " The Supreme Court of Law in the Church."

That the ministers of the said association are divided into orders of bishops, elders and deacons, the members of which orders must possess certain qualifications and have certain duties to perform.

That the " Immanuel's Church of the Evangelical Association of the City of Reading, in the county of Berks," composed of members of the said religious association, is a corporation erected by the Court of Common Pleas of Berks County, Nov. 21, 1866, the charter whereof provides for the election of seven trustees, in whom the estate of the church, real, personal and mixed, shall be vested, and provides that the corporation shall be subject to the fundamental law or discipline.

That by deed dated May 31, 1884, certain property, being the property in question, was conveyed to the officers of the said corporation " in trust, to be kept, used and maintained as a place of divine worship by the ministry and membership of the Evangelical Association of North America, with power to dispose of and convey the same, subject to the discipline, usage and ministerial appointments of said church or association, as from time to time authorized and declared by the general conference of said association and the annual conference in whose bounds the said premises are situate ;" that at great cost, with money contributed by the members of the said association, a valuable building was erected upon the said property, in which building the said congregation worshiped.

That the said church is situate in the East Pennsylvania Conference, which, during the year 1891, was under the charge of Thomas Bowman, a duly elected bishop of the said association.

That, under the fundamental law and discipline, the bishop, at the annual conference, and the presiding elders shall, at a meeting of the conference, assign the preachers their respective fields of labor, and that, at the meeting of the East Pennsylvania Conference, held in March, 1891, the said Thomas Bowman, bishop, and the presiding elders assigned Augustus Krecker, one of the plaintiffs, to the said church, to which church he had been duly assigned for the preceding year, and in which, at the time of his re-assignment, he was lawfully exercising the rights of pastor.

That, upon the re-assignment of the said Augustus Krecker,

the defendants, with many others, conspired together for the
purpose of preventing him from acting as pastor of the said
church, and procured a majority of the trustees to adopt a reso-
lution excluding him, and providing that Jonas H. Shirey, one
of the defendants, should be recognized as pastor, and on
March 8, 1891, actually and forcibly prevented the said Augus-
tus Krecker from going into the pulpit.

That, on Oct. 1, 1891, the general conference of the said as-
sociation met at the city of Indianapolis in regular and stated
quadrennial session, and the matter being brought before the
said general conference and regularly examined, it was ad-
judged and decided that the assignment of the said Augustus
Krecker to said church was regular and was the only regular
and valid assignment.

That on Nov. 13, 1891, after the decision of the general con-
ference, the said Augustus Krecker notified the said Jonas H.
Shirey and the other defendants of the said decision and de-
manded admission to the said church, which was refused.

The bill prayed : (1) For an injunction restraining defend-
ants from excluding the said Augustus Krecker from the ex-
ercise of his rights as pastor. (2) That defendants may be
enjoined from time to time to admit to the pastoral rights of the
said church, whomsoever the bishop elected by the general
conference, may, with the assistance of the presiding elders
and in accordance with the discipline, assign to the said church.
(3) That the trustees which passed the revolutionary resolu-
tion aforesaid may be deposed, and an election to fill the
vacancies thus created be ordered. (4) General relief.

In the answer, defendants deny that any of the acts with
which they are charged were unlawful, averring, amongst other
things, that the said Thomas Bowman, before the time of the
sitting of the East Pennsylvania Conference in February and
March, 1891, to wit, on March 7, 1890, had been tried in ac-
cordance with the discipline upon charges of immoral conduct
and suspended from the office of bishop, wherefore he, the said
Thomas Bowman, was, under the law and discipline of said as-
sociation, excluded from in any way performing official func-
tions ; that the East Pennsylvania Conference did thereupon
organize by electing C. S. Haman, a presiding elder, as presi-
dent, which said conference, in the transaction of its functions

and in accordance with the discipline, did, amongst other things, assign and appoint the said Jonas H. Shirey, defendant, to the pastoral charge of said Immanuel's Church; that said conference presided over by said C. S. Haman was the only rightful East Pennsylvania Conference, and that said Jonas H. Shirey was and is the only rightful pastor of said church; that the general conference of said association alleged to have been held at Indianapolis, in October, 1891, was not the lawful general conference of said association, but that the general conference held at Philadelphia, in October, 1891, was such lawful conference; that the action of the trustees of Immanuel's Church in excluding said Augustus Krecker from the pulpit and pastoral charge of said church was in accordance with the discipline of the association and the provisions of the deed of conveyance of said church property, and that the plaintiffs were not deprived of any of their rights and privileges as members of said church, but voluntarily and without cause withdrew from said church and congregation and organized a new congregation elsewhere, by reason of which they have forfeited and relinquished all right to and title in said Immanuel's Church, and that at the general conference of said association, held at Philadelphia, as aforesaid, it was, amongst other things, adjudged and decided that the assignment of said Jonas H. Shirey to said Immanuel's Church was regular and valid, and that he was and is the only rightful pastor thereof, although defendants deny that the general conference has any jurisdiction over the appointments of preachers by the president and presiding elders of the annual conference. The answer also avers that plaintiffs, aided and directed by J. J. Esher and Thomas Bowman, falsely claiming to be bishops of said association, are, by usurpation of power and authority, unwarrantably undertaking to subvert the discipline and unlawfully striving to erect a new church system at variance with the constitution and principles of the Evangelical Association, and that said opposers of the discipline have diverted the funds and property of said association from their proper use to the use of said new system, and threaten and intend, if the property of said Immanuel's Church shall come into their control, to divert it to the same unlawful purpose. The defendants aver that they, and those united with them, have always adhered to the provisions of the discipline,

and are, in truth and fact, the Evangelical Association of North America, and as such entitled to use its name and property for the proper purposes thereof.

The following are the pertinent provisions of the discipline:

" At the annual conferences a bishop shall act as president; if there be no bishop present, the conference shall elect one of the elders as chairman:" § 61.

(A record of) " all accounts and transactions of the conference . . . . shall be submitted to the next general conference for inspection and examination:" § 62.

" The president and presiding elders shall (at the annual conferences: § 99) assign to the preachers their respective fields of labor (for one year).    The presiding elders shall be appointed to their districts by the conferences:" § 63.

" The general conference shall consist of one member for every 14, or surplus of 7 or more members of each annual conference, who are to be elected from among the elders by the majority of votes of said annual conferences:" § 70.

" The time and place of the general conference shall be appointed by the bishops, with the consent of a majority of the (general) conference; and if there be no bishop present the general conference shall do it by a majority of votes, or the oldest annual conference, who then shall give the other annual conferences due notice of the time and place:" § 71.

" At general conference a bishop shall preside; but if there be no bishop present, then the president shall be elected in like manner as at the annual conferences.

" Two thirds of the aggregate number of delegates (in 1891, according to the ratio prescribed in §§ 70, 122) shall constitute a quorum:" § 72.

" The general conference shall have power to make rules and arrangements for our church, under the following restrictions:

" 1. The general conference shall have no power to alter, to detract from or add to any of our articles of faith. . . .

" 2. It shall have no power to alter any rules or forms of our church discipline (the rules of our temporal economy being excepted), unless such alterations are previously recommended by two thirds of the members of all the annual conferences who may be present at the sessions of the same. . . . § 73.

" The general conference is the supreme court of law in the

church ; it shall decide upon the legality of all acts of annual conferences, and upon all such cases as may arise between the annual conferences, and such as may arise between any incorporated society of the church and its officers or any annual conference; and in its judicial capacity it shall decide, render verdict and declare judgment only on such cases as are lawfully brought before it for adjudication.   It shall have power to make such rules and regulations as will enable it to execute the powers conferred upon it:" § 74.

(A bishop is amenable) " to the general conference, which has power, if circumstances require it, to depose a bishop from office or to expel him from the church :" § 124.

(In the interval between two general conferences,) " if a bishop be accused of immoral conduct, three of the elders are to meet and examine the bishop ; and if the three elders are actually of the opinion that the bishop is guilty of the alleged crime, they shall call one or two presiding elders, and as many preachers standing in full connection as they may deem necessary, yet so that they be not less than seven in number ; whereof at least one shall be a presiding elder.   These are to constitute a conference, who shall examine the charge alleged against him; and if two thirds of the preachers thus called shall find the bishop guilty of the charge brought against him, they shall have power to suspend him from office until the next general conference, which shall then determine the whole matter.

" But a charge against a bishop must always be preferred in writing and subscribed by those who are willing to substantiate the alleged crime, and the accused bishop is to have a copy of the same. `

" None of our ministers thus excluded can in any wise perform official functions among us, neither be acknowledged by us, without true penitential confession and reformation, and without being anew received on trial into our chnrch :" § 125.

The facts appear by the opinion of the Supreme Court.

The case was referred to Louis Richards, Esq., as examiner and master, who reported in favor of dismissing the bill.

Exceptions to the master's report were dismissed by the court in an opinion by ENDLICH, J.   Plaintiffs appealed.

*Errors assigned* were (1–41) in dismissing exceptions to mas-

ter's report, portions of opinion of the court, and in dismissing the bill.

*Cyrus G. Derr* and *Edward Harvey, Augustus S. Sassaman* and *Ritchie & Echer* with them, for appellants.—The Buffalo Conference of 1887 had power under the discipline to refer to the board of publication the selection of a place for the session of 1891: State ex rel. Dubs v. Esher, 6 Ohio C. C. 312; Auracher v. Yerger, 25 Chi. Leg. N. 197; Schweiker v. Husser, 146 Ill. 399; McGinnis v. Watson, 41 Pa. 14; Watson v. Farris, 45 Mo. 196; Smith v. Swormstedt, 16 How. 308; Gibson v. Armstrong, 7 B. Mon. 510; Endlich on Int. Stat. § 527; Field v. Clark, 143 U. S. 691; Lithog. Co. v. Sarony, 111 U. S. 57; The Laura, 114 U. S. 411; Com. v. Green, 4 Whart. 531; Com. v. Clark, 7 W. & S. 127; Schlichter v. Keiter, 156 Pa. 119; Miller v. State, 3 Ohio, 474; Kilgore v. Magee, 85 Pa. 401; Huston v. Clark, 112 Ill. 344; McCulloch v. Maryland, 4 Wheat. 421; Knox v. Lee, 12 Wall. 457; Baldwin v. Franks, 120 U. S. 678; U. S. Reese, 92 U. S. 253; Bladen v. Phila., 60 Pa. 464; Pittsburg v. Coursin, 74 Pa. 400; Cooley, Const. Lim. 82.

The action of the Buffalo conference was a construction of its own disciplinary powers in a manner and upon a matter that is conclusive upon the civil courts: Schweiker v. Husser, 146 Ill. 428; Schlichter v. Keiter, 156 Pa. 119; Watson v. Jones, 13 Wall. 679; Smith v. Swormstedt, 16 How. 308; 1 High on Inj. § 310.

The board of publication proceeded lawfully in October, 1890, and the act of selecting the place was duly performed: Doremus v. Church, 3 N. J. Eq. 332; Sampsell v. Esher, 26 West. Law Bul. 162; Scadding v. Lorant, 5 E. L. & Eq. 163; 1 Dill. Mun. Corp., 4th ed. §§ 94, 199, 212, 256, 272, 844; Sawyer's Case, 124 U. S. 200; Hagner v. Heyberger, 7 W. & S. 104.

The fact that Bishop Esher presided over the Indianapolis Conference, when it first opened its session, did not invalidate the proceedings of that body.

The annual conferences over which Bishops Esher and Bowman presided in 1890 and 1891, might lawfully elect delegates to general conference, even though those bishops were lawfully suspended.

The Indianapolis Conference lawfully passed upon the alleged suspensions of the bishops.    Defendants have no standing in court on this issue : Kerr's Ap., 89 Pa. 112 ; Roshi's Ap., 69 Pa. 470 ; Com. v. German Society, 15 Pa. 251.

The Indianapolis Conference had full power to decide as it did as to the invalidity of the several assemblies assuming to be annual Conferences, and as to the appointments of preachers and presiding elders thereat: Price v. Skiller, 73 Me. 586 ; s. c., 36 Am. R. 325.

The Indianapolis Conference's action in regard to "seceding ministers" was valid, as they refused submission to the rules of the church: Roshi's Ap., 69 Pa. 465 ; Brooke v. Shacklett, 13. Gratt. 320 ; Den v. Bolton, 7 Halst. 214 ; Burt v. Oneida Com., 137 N..Y. 346 ; Henderson v. Hunter, 59 Pa. 335.

The decision of the Indianapolis Conference as to the bishops' trials is binding upon the civil courts.

The Philadelphia body was not a lawful conference : Schweiker v. Husser, 34 N. E. R. 1028.

Even if the old presiding elders were not lawfully "located," because no trial was had, yet Mr. Krecker was lawfully appointed in 1891, if Bishop Bowman's suspension is accepted by this court as void.

If plaintiff Krecker was appointed in due conformity to the discipline, he may not lawfully be excluded by a majority of this congregation, notwithstanding the act of April 26, 1855 : Thompson v. Swoope, 24 Pa. 474 ; Ev. Assn.'s Ap., 35 Pa. 316 ; Appeal of First Meth. Pr. Church of Scranton, 16 W. N. 245.

*Jefferson Snyder* and *Geo. F. Baer*, for appellees.—The conference which convened at Allentown in February, 1891, presided over by Mr. Haman, was the legal East Pennsylvania Annual Conference, and the assignment of Mr. Shirey to the pastorate of the defendant church was valid, because it was made by the president of that conference and the presiding elders of the district.    A majority of all present in obedience to a call constitute a quorum : St. Mary's Church Case, 7 S. & R. 517 ; Craig v. Church, 88 Pa. 42 ; Com. v. Green, 4 Whart. 531 ; Presbyterian Congregation v. Johnston, 1 W. & S. 38.

Assuming, but not conceding, that the Indianapolis Confer-

ence was itself the legal general conference, it could not and did not by the due exercise of any lawful authority constitute the Bowman Allentown Conference the legal and regular East Pennsylvania Conference : Kerr's Ap., 89 Pa. 112; McGinnis v. Watson, 41 Pa. 14; Sutter v. Trustees, 42 Pa. 512; Com. v. Green, 4 Whart. 531; McAuley's Ap., 77 Pa. 397; Williamson v. Berry, 8 Howard, 495; Thompson v. Whitman, 18 Wall. 467; Kilbourn v. Thompson, 103 U. S. 168; Schlichter v. Keiter, 156 Pa. 137; App v. Lutheran Congregation, 6 Pa. 201; R. R. v. Com., 1 Ohio, 77; Cooley, Const. Lim., 3d ed. 22; Hoffman's N. Y. Ecclesiastical Law, 276; O'Hara v. Stack, 90 Pa. 490; Jones v. State, 44 N. W. R. 658; Smith v. Nelson, 18 Vt. 511.

The Indianapolis assemblage was not the legal general conference, owing to the invalidity of its call. As to delegated functions, see Broom's Legal Maxims, 842; Hawley v. James, 5 Paige, 487; Speight's Case, L. R. 22 Ch. D. 727; Morawetz, Corp., 2d ed. 535.

The majority of a congregation must be permitted to determine for themselves whither they will go when a denomination divides on matters not relating to faith or worship : Trustees v. St. Michael's Church, 48 Pa. 20; Church v. Remmington, 1 Watts, 218; Presbyterian Congregation v. Johnson, 1 W. & S. 40.

*Cyrus G. Derr* and *Edward Harvey, Augustus S. Sassaman* and *Ritchie & Esher* with them, for appellants, in reply.—Every religious society, for its own internal order and for the mode in which it fulfills its functions, is a law unto itself provided it keeps within the bounds of social order and morality : McGinnis v. Watson, 41 Pa. 14; Sutter v. Church, 42 Pa. 509; Roshi's Ap., 69 Pa. 462; Watson v. Jones, 13 Wall. 680; Com. v. Green, 4 Whart. 603; Church v. Seibert, 3 Pa. 282; Henderson v. Hunter, 59 Pa. 343; Harmon v. Dreher, 2 Speer's Eq. 87; Shannon v. Frost, 3 B. Mon. 253; Chase v. Cheney, 58 Ill. 509; Walker v. Wainwright, 16 Barb. 486; Church v. Wetherill, 3 Paige, 296; McIlvain v. Church, 2 Woodw. Dec. 293; Winebrenner v. Colder, 43 Pa. 244; Locke's Ap., 72 Pa. 491; Com. v. Pittsburg, 14 Pa. 177; Bageley v. Iron Co., 146 Pa. 478; Moers v. Reading, 21 Pa. 188; Smith v. McCarthy,

56 Pa. 359; Com. v. Judges, 8 Pa. 391; R. R. v. Com'rs, 1 Ohio, 77; Hitchcock v. Galveston, 96 U. S. 347; Burrill v. Bank, 2 Metc. 163; Hoyt v. Thompson, 19 N. Y. 207; Kramrath v. Albany, 127 N. Y. 575.

As to conclusiveness of the decisions of the general conference we cite: Harmon v. Dreher, 2 Speer Eq. 87; Ferraria v. Vasconcelles, 23 Ill. 403; Chase v. Cheney, 58 Ill. 509; Mitchell v. Mulholland, 106 Ill. 189; Watson v. Farris, 45 Mo. 183; Gaff v. Green, 88 Ind. 122.

We refer the court to the following additional authorities bearing on the leading points of the controversy.   Under them it is evident that the acts of defendants are treated by the courts as secession.   By denying their connectional relation with the judicatories of the church—by organizing other and antagonistic conferences—they have " as result of their acts " withdrawn from the association and " have no title to the property " held prior to 1891: Schlichter v. Keiter, 156 Pa. 147; Jones v. Wadsworth, 11 Phila. 227; People v. Steele, (S. C. of New York) 7 Pa. Law Jour. 324; Skilton v. Webster, Brightley's R. 246; Trustee v. Sturgeon, 9 Pa. 321; Sarver's Ap., 81* Pa. 183; Com. v. Cornish, 13 Pa. 288; Whitecar v. Michener, 37 N. J. Eq. 6; Woodside's Ap., 4 Penny. 124; McAuley's Ap., 77 Pa. 397; Schnorr's Ap., 67 Pa. 138; Winebrenner v. Colder, 43 Pa. 244; Ramsey's Ap., 88 Pa. 60; Landis's Ap., 102 Pa. 467; Sawer v. Gosser, 1 W. N. 56; Trexler v. Menning, 2 W. N. 680; Field v. Field, 9 Wend. 394.

OPINION BY MR. JUSTICE WILLIAMS, Oct. 1, 1894:

The legal questions involved in this case are interesting and important, but they are no longer open in this state.   The labor which it has been necessary to expend upon the case in the court below and in this Court has been over the facts, and the inferences that ought to be drawn from them.   This labor is made no less burdensome by the character of the facts to be passed upon.   The conduct of the parties and their sympathizers on both sides seems to have been hasty, uncharitable and ill tempered.   It affords a travesty, rather than an illustration, of the precepts of the religion of peace for the support and diffusion of which the church was organized and the parties on both sides profess to have devoted their energies and their lives.

But our concern is with the legal aspects of the case presented to us, and to them we turn, leaving the moral side of the controversy to the consciences of the combatants.

The Evangelical Association of North America is a religious body that had its origin early in the present century. Its history presents a rapid growth and a career of usefulness. Its statistics for the year 1891 showed a membership of about one hundred and fifty thousand. These were gathered into more than two thousand churches, and under the pastoral care of about twelve hundred and fifty preachers. Its ecclesiastical organization rests on the individual church or congregation. A convenient number of these form a quarterly conference, the sessions of which are presided over by a presiding elder. Several quarterly conferences grouped together by the action of the general conference form an annual conference, of which there were twenty-five in existence in 1891. The annual conferences elect delegates, according to a ratio previously fixed upon, to represent them in the general conference which meets once in four years, and which is the highest body, legislative and judicial, in the denomination.

The bishops, of whom there were three in 1891, and certain executive officers, are ex officio members of the general conference. The powers of this body are defined by the book of discipline. Paragraph 74, page 57, declares it to be " the supreme court of law in the church." It has appellate jurisdiction of cases heard in the lower church tribunals and original jurisdiction over all controversies to which the annual conferences are parties, or that affect the legality or regularity of their action. It has jurisdiction over the bishops to try, suspend, depose, and expel them.

Paragraph 73, page 56, declares it to be the supreme legislative body in the church, subject however to two limitations upon its power. It cannot disturb the articles of faith. It cannot abandon the itinerancy or change the forms of church discipline. It also possesses general administrative powers which are recognized in several paragraphs of the book of discipline, among which are Nos. 72, 73, 76 and 93. It fixes the number of bishops needed, elects them, and directs and supervises their work. It organizes and fixes the boundaries and names of the annual conferences. It conducts, through boards

and committees, the publication and missionary enterprises of the denomination.

In 1887 this denominational body with all its religious and ecclesiastical machinery was in harmonious and successful operation. Its general conference was in session in Buffalo, N. Y., and the several annual conferences were represented therein. In 1891 there were two bodies in session at the same time, in different portions of the country, each claiming to be the general conference of the Evangelical Association. Each elected bishops and claimed jurisdiction over the annual conferences and the publication and missionary boards of the church.

The litigants in this case are adherents of these rival bodies; the plaintiff claiming title under one of them, and the defendants under the other. The first and the controlling question in this case is thus seen to be one of ecclesiastical identity. Which of these contesting bodies is the general conference of the Evangelical Association? The next question is which of the parties now before us adheres to, and derives title under, the body found to be the general conference?

Now it must be borne in mind that the organization of a denominational body or church involves the adoption of a religious creed, and an ecclesiastical polity. Adherence to a particular body requires therefore adherence to both the creed and the polity. To abandon or to repudiate either is to abandon or secede from the body whose authority is thus disregarded.

In this case both parties claim to adhere to the creed of the Evangelical Association and it seems to be conceded that no question of religious belief enters into the controversy. The points of difference arose under the polity of the church, and rested on conflicting interpretations of provisions of the book of discipline. The first of these was over the meaning of paragraph 71, page 56, which provides for fixing the time and place of meeting of the general conference. This paragraph empowers the bishops in attendance upon the general conference to name the time and place for the next meeting of the body, subject to the approval or disapproval of the body itself. If the first suggestion of the bishops is not approved they should make and submit another, and so on, until an agreement is arrived at. If the bishops are not present, the general conference proceeds to fix the time and place in the first instance. If for any reason

the time and place are not fixed in either of these ways and the conference adjourns without action on the subject, then the duty falls upon the oldest annual conference, and must be discharged, and the necessary notices given to the other conferences, so as to prevent a failure of the session of general conference during the proper year. The questions raised upon this paragraph were, first, what is the nature of the duty imposed by it? Is it legislative or administrative? Second: If administrative, what shall amount to a performance?

The laws of the church provided for a meeting of the general conference once in four years; but they did not, because they could not, fix in advance the particular day and place at which these quadrennial meetings should be held. But the laws could, and did, make provision for the fixing of both time and place, by naming the instrumentalities by which these details should be settled from time to time, as the circumstances then existing might seem to require. It devolved the duty of naming the time and place first on the bishops and the general conference. Next on the general conference alone. Lastly, in case neither of these instrumentalities discharged it, on the oldest annual conference. The act had the same character by whichever of these bodies it was performed. It was a settlement of a matter of detail necessary to the administration of the polity or ecclesiastical system of the church. It was therefore an act of administration, not of legislation. The general rule is that the power to perform such acts may be delegated, and that the acts, when properly done by the appointee, are valid as the acts of the principal.

We proceed therefore to inquire what the board of publication did under the authority given it by the bishops and the general conference of 1887. It appears that a usage exists in this denomination that prevails in most, if not all, religious bodies. It is to receive invitations from towns and churches willing to entertain the body, and then select from the list of places offered that which is most desirable. In 1887, when this order of business was reached, the general conference had no offer of entertainment before it. It seemed best under the circumstances, to the bishops and to the conference, to authorize the board of publication to receive offers of entertainment after the adjournment, and to correspond with the annual con-

ferences upon the subject, and, after full consideration, to de-
cide upon the place for the next session.   This board was one
of the permanent executive agencies of the church.   It in-
cluded all the bishops in its membership, and eight other per-
sons, each of whom was selected from one of the eight districts
into which the whole church was divided for this purpose.
After considerable inquiry and correspondence this board named
Indianapolis as the place, and gave notice of this fact to the
annual conferences.   This was a complete discharge of the
duty imposed upon the board of publication.   It fixed defi-
nitely the place for the holding of the next general conference
with the same effect as though the place had been named by
the conference itself, and it afforded ample opportunity to all
the annual conferences to be represented therein.   Several
months later the annual conference of East Pennsylvania met
in Ebenezer Church in the city of Allentown.   Without paus-
ing to inquire into the regularity of its organization, or its
power, under the book of discipline, to perform the proper
work of an annual conference, but treating this body as being
what it claimed to be, we will consider its action.   It was a
subordinate tribunal whose judgments were removable by ap-
peal to the general conference, but it assumed the right to
review and sit in judgment upon the action of its superior.   It
pronounced the action of the general conference of 1887 in
relation to the place of its next meeting to be a violation of
the discipline, and therefore absolutely null and void.   It then
proceeded, as the oldest annual conference, to fix upon Phila-
delphia as the place, and gave notice of its action to the sev-
eral annual conferences.   This action was unnecessary.   The
time and place had been fixed by, or under the authority of,
the general conference.   The annual conferences had been no-
tified in ample time to enable them to arrange for the attend-
ance of their delegates.   The place had not been objected to
as unsuitable or inconvenient.   If the delegation of the power
to fix the place to the board of publication had been question-
able, it had been unanimously acquiesced in at the time it was
made, and, under the circumstances, seemed the only practica-
ble thing to do.   It worked no injury to the ecclesiastical body
and affected injuriously no interest or enterprise of the church.
But this action was not only unnecessary, it was disrespect-

ful, irregular and insubordinate.  It put the judgment of the annual conference of East Pennsylvania against that of the supreme judicatory of the denomination upon a question affecting the construction of certain provisions in the discipline.  It not only overruled its ecclesiastical superior, but it proceeded to act upon its own interpretation of the discipline in opposition to the action of its superior; and to call upon the other annual conferences to accept its decision, and reject that of the Supreme Court of Law of the Church upon the same subject. This was not revolution within, but rebellion against, the ecclesiastical organization.  Most of the annual conferences seem to have regarded the subject in this light, for eighteen of them sent undivided delegations to Indianapolis, while but two sent undivided delegations to Philadelphia.  The remaining five were divided in opinion and sent delegates to each place.  The general conference meeting in Indianapolis had not only a quorum, but a decided majority of all the delegates to which the annual conferences were entitled.  It had also the two acting bishops and the other ex-officio members of the body. The alleged general conference that met in Philadelphia did not have a quorum of those entitled to sit in general conference and, as the master has well found, was incompetent under the book of discipline to transact business.  It nevertheless assumed to set aside the authority of the body that met in Indianapolis, and to exercise the powers and functions of a lawful general conference.  In fact it claimed to be the lawful successor of the general conference of 1887, and the supreme authority in the church.

This, as we have said, was an open revolt.  The churches and conferences that participated in it have from that time kept up an independent organization, and refused obedience to the conference that represented the majority, and maintained the ecclesiastical organization of the denomination.  The result has been a divided body, and, what is more to be regretted, divided local congregations, creating discord, litigation and personal bitterness throughout the East Pennsylvania and several other annual conferences, in which the Philadelphia General Conference had its supporters.

It follows necessarily that those who adhere to the Indianapolis General Conference constitute the Evangelical Association.

Those that adhere to the hostile body that met in Philadelphia are by their own acts put on the outside of the ecclesiastical organization, and must remain there until they recognize once more the authority of the body from which they have separated : Winebrenner et al. v. Calder et al., 43 Pa. 244 ; Kerr v. Trego, 47 Pa. 292 ; Roshi's Appeal, 69 Pa. 462. The title to the church property of a congregation that is divided is in that part of the congregation that is in harmony with its own laws, usages and customs as accepted by the body before the division took place, and who adhere to the regular organization : McGinnis v. Watson et al., 41 Pa. 9 ; McAuley's Appeal, 77 Pa. 397 ; Landis's Appeal, 102 Pa. 467.

It does not matter that a majority of any given congregation or annual conference is with those who dissent. The power of the majority as well as that of the minority is bound by the discipline, and so are all the tribunals of the church from the lowest to the highest : McAuley's Appeal, 77 Pa. 397 ; Sutter et al. v. The Reformed Dutch Church, 42 Pa. 503 ; Stack v. O'Hara, 90 Pa. 477 ; Schlichter et al. v. Keiter et al., 156 Pa. 119. The laws of the ecclesiastical body will be recognized and enforced by the civil courts when not in conflict with the constitution and laws of the state. A sufficient reason for this is that they have been made or assented to by the parties, who have agreed with each other by the act of uniting with the body to be governed by its laws and usages : Tuigg v. Treacy, 104 Pa. 493. An independent congregation may be governed by the majority of its own membership, but a congregation connected with any given denomination must submit to the system of discipline peculiar to the body with which it is connected : Ehrenfeldt's Appeal, 101 Pa. 186 ; Fernstler et al. v. Seibert et al., 114 Pa. 196.

Upon questions arising under the discipline, as upon those arising under the articles of faith, the decisions of the ecclesiastical courts are ordinarily final, and they will be respected and enforced by the courts of law : German Reformed Church v. Seibert et al., 3 Pa. 282 ; Stack v. O'Hara, 90 Pa. 477 ; Schlichter v. Keiter, 156 Pa. 119. But if such decisions plainly violate the law they profess to administer, or are in conflict with the laws of the land, they will not be followed : Commonwealth ex rel. v. Cornish, 13 Pa. 288 ; Stack v. O'Hara, supra.

Now the itinerant plan for pastoral supply of the churches is a distinguishing feature of the polity of the Evangelical Association. The individual congregation cannot select for itself, but is bound to accept the ministerial supply provided for it by the proper authorities under the discipline. Their action in this regard affords a distinct test of obedience, and of adherence to the ecclesiastical organization: Henderson v. Hunter, 59 Pa. 335. Those congregations or parts of congregations that refuse the supply sent them by authority of the regular ecclesiastical agencies acting in accord with the general conference, and receive a supply sent under the authority of an irregular, minority body, do not adhere to the organization but put themselves in open revolt against it. By such action they subject themselves as individuals to suspension or expulsion from the church; as congregations and annual conferences they expose themselves to punishment by excision from the body with which they have ceased to be in harmony, and against the authority of which they have arrayed themselves.

Upon the facts as they appear in the evidence the learned master should have found that the general conference meeting at Indianapolis in 1891 was the regular and the duly constituted general conference of the Evangelical Association of North America, and that the body which met the same year in the city of Philadelphia was an irregular and hostile body, having no ecclesiastical authority whatever under the provisions of the book of discipline.

He should then have found that those who adhere to the regular general conference and submit to its authority, constitute the Evangelical Association. He should also have found that those who adhere to the irregular and hostile body, have by their own conduct placed themselves outside of the denomination whose authority they reject.

These conclusions we reach independently of the various questions which relate to the trials of the bishops, and the organization of the East Pennsylvania Conference in 1891. But these questions are fairly before us, and we have no disposition to decline an examination of them; indeed, the reasons for the conclusions already reached will be made the more apparent by a brief discussion of these questions. Bishop Dubbs was tried before a properly constituted trial conference, found guilty, and

sentenced to suspension from office until the next general conference.   He denied the justice, but not the validity, of his conviction ; and he acquiesced in the sentence pronounced upon him.   No question affecting this trial and sentence is presented by this record, and an examination into the subject is unnecessary and irrelevant.   The charges on which Bishop Dubbs was tried were formulated in November and December, 1889.   The trial took place in February, 1890.   In December, 1889, Bishops Esher and Bowman were separately examined by three elders on charges that had been made in certain religious periodicals, and brought to the attention of the examining elders by one who acted as a prosecutor.   The examining elders found the charges to be without foundation in each case, and prepared a certificate showing the nature of the charges, the examination made by them, and their finding acquitting the accused thereon, and delivered a copy of such finding to each of the bishops. A few weeks later, substantially the same charges were made by another prosecutor ; another examination was made by three elders summoned by him.   This examination resulted in a finding that the charges were well founded, and the calling of a trial conference for the trial of each of the bishops upon them. From the beginning of this second proceeding both Bishop Esher and Bishop Bowman set up the former examination and acquittal as a conclusive bar against it, and insisted that the second board of examiners and the trial conference convened by their direction, were without jurisdiction.   The examining elders however, and the respective trial conferences called by them, promptly overruled the point raised by the bishops, asserted their jurisdiction, and proceeded with the trial.   The bishops declined to appear ; but in their absence, and with full knowledge of the previous examination and acquittal of each on substantially the same charges, the trial conferences heard testimony, found the accused guilty, and sentenced each to suspension from the episcopal office until the next general conference.   Neither of the bishops acquiesced in the sentence. On the contrary each insisted that his second examination, and the proceedings of the trial conference following it, were illegal and void ; that the sentences were without authority, and might properly be disregarded by them and by the whole church.

The decision of the question thus raised by the bishops de-

pended upon the proper interpretation of certain provisions of the book of discipline. It was therefore a question of ecclesiastical law to be decided by the highest ecclesiastical tribunal in the denomination. The trial conferences took the responsibility of deciding it in favor of their own jurisdiction. The bishops took the responsibility of deciding it the other way. The trial conferences knew that if the general conference overruled them upon this point all their proceedings must necessarily be held to be illegal and oppressive. The bishops knew that if general conference did not sustain their point their conduct in refusing to appear, and in disregarding the sentence pronounced upon them, must be held to be insubordinate, and their subsequent official acts to be invalid. Both sides were willing to take the risks, and to act upon their own interpretation of the discipline. The result was widespread discussion throughout the church, diverse conclusions, bitter dissensions, and finally, as we have seen, a disruption of the ecclesiastical body. For these unhappy consequences, which a more conciliatory course might have avoided, an impartial public will hold both the bishops and the trial conferences responsible.

When the general conference met in 1891, it took notice of the dissensions and divisions that had grown up in the annual conferences and in the congregations of which they were composed, and made inquiry into the causes that had led to such unhappy consequences. The result was an exposition of the discipline in accordance with the contention of the bishops, an indorsement of their conduct in disregarding the sentences imposed upon them, and an authoritative deliverance that the second examination, the trial, conviction and sentence of each of the bishops was irregular, illegal and void. This validated all the official acts of both the bishops, and invalidated the acts of the annual conferences, and others, done on the theory that the convictions and sentences were legal.

We have before us therefore the decision of the "Supreme Court of Law" of the Evangelical Association, upon the meaning and effect of one of the provisions of the book of discipline. This decision cannot be said to violate the constitution or the law of the land. It does not violate any law or usage of the ecclesiastical body. It is therefore binding on the Evangelical Association and its membership, and it must be respected by this Court.

Whether the general conference disposed of this question in the wisest manner is not now for consideration. Its decision settled the law for the Evangelical Association and we must recognize and apply it in this case. Here again the body that met in Philadelphia in 1891 put itself in open rebellion against the authority of the Evangelical Association. It decided that a charge preferred against a bishop, an examination into its truth by three elders, and an acquittal by them, had no significance whatever; but that the charge might be renewed and the examination repeated as often as a prosecutor could be found, or until a conviction and sentence could be obtained. It then approved the conviction and sentence of Bishops Esher and Bowman, and expelled both from the association. At the same time it reversed the proceedings in the case of Bishop Dubbs, which had been approved by the Indianapolis general conference, relieved him from the sentence, and re-elected him to the office of bishop. In what manner the Philadelphia body could have made its antagonism to the general conference more open and pronounced it is not easy to see.

It only remains to consider briefly the claims of the rival East Pennsylvania conferences. The time and place for the meeting of the Annual Conference of East Pennsylvania in 1891 had been regularly fixed. The place was Ebenezer Church in the city of Allentown. The time was the 26th of February. This was about one year after the trial and sentence of Bishop Bowman, and after his own position and that of a large part of the church upon the question of the legality of his suspension were well known. Bishop Bowman came to Allentown to preside over the conference. The board of trustees of the Ebenezer Church, although without any ecclesiastical jurisdiction over the subject, met and decided that Bishop Bowman was incompetent to preside over the conference because of his suspension by the trial conference. They then undertook to enforce the sentence of suspension by preventing him from entering the church edifice. A majority of the members of the conference was in active sympathy with this action, and co-operated with the trustees for the purpose of carrying it into effect. They signed a paper denying his right to preside, and by a committee from their number presented this paper, and a copy of the action taken by the trustees, to the bishop. At the hour

fixed for the meeting of the conference, the bishop approached
the doors of Ebenezer Church. He was intercepted by the
trustees and others, and prevented, by the use of force, from
entering. Meantime the members of conference assembled in
the building, and a majority of them, well knowing that the
bishop was at the door, and prevented by force from entering,
treated him as absent and organized the conference by the elec-
tion of a president to discharge his duties. They were well
aware of the point raised by him affecting the legality of his
sentence, and of the fact that a considerable portion of the
whole church concurred with him in opinion. They knew also
that the general conference would be in session within a few
months and that the question could then be decided. Notwith-
standing all this, these persons acted, as the trial conferences
had done, on their own exposition of the discipline, and took the
risk of being overruled by the general conference. They de-
liberately staked their official action, and their ecclesiastical
position, upon their own decision of a question that was not
within their jurisdiction, and they lost.

The general conference sustained the point taken by the bish-
ops, held their sentence and conviction illegal, and the action
of the conference of East Pennsylvania to be disorderly and in
violation of the book of discipline. The organization effected
by the forcible exclusion of the bishop was declared to be ille-
gal, and the body itself, while so organized, to be without eccle-
siastical character or authority. It is clear that the regularity
and legal effect of the organization of the conference, in the
manner in which it was accomplished, raised an ecclesiastical
question. Its decision depended upon an exposition of certain
provisions of the discipline which it was the duty of the gen-
eral conference to make. The decision actually made does not
violate the laws of the state or of the church, and is conclusive
upon the ecclesiastical body of which the general conference is
the chief tribunal. For this reason it should be followed by
the civil courts.

Whatever authority may be conceded to the action of the
East Pennsylvania Conference by those who adhere to it, the
judgment of the general conference leaves it without authority
in the body with which it had been formerly connected. Its
appointments therefore confer no right, and impose no duty,

on preachers, church members of congregations adhering to the general conference; and we cannot recognize a title derived, like that of the defendants in this case, from the action of that body, as good against the general conference or its adherents.

On the other hand the action of Bishop Bowman and a few friends in organizing a rival conference was wholly unauthorized by the discipline; and the body so organized, not having a quorum of those entitled to sit as members of the East Pennsylvania Conference, was an irregular body, without authority or ecclesiastical character under the discipline. The annual conference may sit without a bishop, and its acts be valid in all respects. A bishop cannot sit with less than a quorum and make by his presence a legal conference out of that which would not have been such in his absence. If present he presides, but he is not a necessary part of the body; and his presence therefore with those who without him would be without authority, can add nothing to them. If there had been no division in the conference the presence of the bishop could not have given to a few of its members the character and power of a quorum. His conduct and that of his friends in suspending and expelling presiding elders and others was a clear usurpation of power and the sentences so pronounced had no force or effect. The situation in Allentown in February, 1891, was certainly remarkable. A majority of the members of the annual conference was in one place, refusing the bishop admission and proceeding upon the assumption that he was absent. The bishop and a handful of adherents were in another place assuming the powers of a quorum and fulminating their orders and judgments with the utmost selfcomplacency and in plain disregard of the discipline. The appointments made by this body gave no legal right to the appointees and imposed no legal duty on the congregations concerned. But the meeting presided over by the bishop was a meeting of those who adhered to the ecclesiastical body whose legislative and judicial head was the general conference. Its members were confronted by a state of things for which the discipline made no provision, viz: the revolt of a majority of the members of the conference with which they were connected. They were compelled to choose between adherence to the bishop and the body with which they had been connected, and adherence to the Annual Conference of East Pennsylvania.

which had undertaken to put itself in an attitude of independence and hostility to that body. They chose the former. They were as a consequence practically outside of the annual conference to which they had belonged, and compelled to seek recognition in some capacity from the general conference. Their organization was therefore necessarily provisional. Their authority depended, in the first instance, on their own consent and that of the congregations and individual members whom they represented; and their only appropriate business was to provide temporarily for the religious and ecclesiastical care of those who adhered to the organization until the general conference could meet and take appropriate action.

The general conference met in October of the same year at Indianapolis. Its attention was drawn to the condition of the church in the East Pennsylvania Conference, and to the action of the rival bodies claiming jurisdiction over the congregations within its bounds. It made a thorough investigation into the action and attitude of the majority body, and was led to recognize the revolt made by it as an accomplished fact. The Philadelphia Conference, called by the East Pennsylvania Annual Conference, it recognized as a rival and hostile body, and declared officially that it was " a gross offence against our church " and that the persons engaged in holding and sustaining it had " thereby thrown off their allegiance to our church and disentitled themselves to any of the privileges of membership therein."

So far the action of the general conference seems to have been regular. But when it came to consider the provisonal gathering of its adherents it exceeded its powers under the discipline. It declared the minority body under the presidency of Bishop Bowman to be the only lawful and regular conference of the Evangelical Association in and for the conference district of East Pennsylvania for 1891, and pronounced all its acts and proceedings regular and lawful.

In so far as these acts related to the temporary care and supply of the congregations represented in the body, they were, as we have already seen, justified by the necessities of the situation; and their ratification by the general conference cured their original want of authority under the discipline, and clothed them with the authority of the general conference. But in so far as these acts dealt with the ecclesiastical positions or functions of

those not members of the provisional body, or with congregations not represented therein, they were unauthorized assumptions of power that the general conference could not ratify because, like the annual conferences, it was bound by the frame of government contained in the book of discipline.   Out of the. provisional body the general conference could create an annual conference, assign its boundaries, and give it a name, and thereafter it would become one of the regularly constituted church tribunals.   But until this was done it was a body for which the polity of the church had made no provision; which had no legislative or judicial power, and no ecclesiastical standing. Its assumption of authority over those represented in the body could be ratified and affirmed by the general conference.   Its assumption of authority over those not represented in the body was incapable of ratification and affirmance.   As to such persons and congregations the want of jurisdiction was apparent and incurable.

We formulate our conclusions as follows:

First. The general conference that met at Indianapolis in 1891 was the regular successor of that of 1887, and was the General Conference of the Evangelical Association of North America.

Second. The alleged general conference that met in Philadelphia in 1891 was an unauthorized body; and its assumption of ecclesiastical authority was an act of rebellion against the organization with which its members had been connected, and whose name it adopted.

Third. Those annual conferences, congregations, and individual church members, that adhere to. the general conference constitute the Evangelical Association.

Fourth. Those annual conferences, congregations, and individual church members that adhere to the Philadelphia body are not within the Evangelical Association but have become by their own acts an independent and hostile association.

Fifth. The property which prior to 1891 belonged to the Evangelical Association, now belongs to, and must be controlled by, those who still constitute that organization.

Sixth. The assignment of the plaintiff Krecker to the pastorate of the Immanuel Church in the city of Reading having been made by a provisional body of adherents without ecclesi-

astical authority, gave him no title capable of enforcement under the law of the church or the law of the land; but the subsequent ratification and adoption of the assignment by the general conference gave him a title from and after that date good under the law of the church, and therefore good under the law of the land.

Seventh. The assignment of the defendant Shirey to the same pastorate by the illegally organized Annual Conference of East Pennsylvania, or by the president of that body sitting without right, and the presiding elders, conferred no title upon him under the discipline and laws of the church as expounded by its court of last resort. He has shown therefore no title capable of enforcement under the law of the land, against the Evangelical Association or its adherents.

Eighth. The question is thus seen to be, not where is the majority of Immanuel Church or of the East Pennsylvania Conference; but which of the parties to this litigation adheres to the general conference. Ecclesiastical standing, and not numbers, determines the title to, and the right of control over property held for the use of the Evangelical Association.

The decree of the court below is reversed,. and it is now ordered, adjudged and decreed, that an injunction be issued to restrain the defendants from exercising control over the church edifice of the Immanuel Church in the city of Reading, and from excluding the plaintiff or any other person appointed to the pastorate of said church, under the discipline of the Evangelical Association and the decision of the general conference, from the pulpit of the said church and from the exercise of his pastoral functions therein.

It is further ordered that the defendants pay the costs accrued in this case.

PER CURIAM, Nov. 5, 1894:

The decree of this court filed October 1st last is modified as to costs by adding to said decree the words " and the said Immanuel Church of the Evangelical Association of the City of Reading, a corporation, under whose direction the individual defendants acted, shall be primarily liable therefor; without any right of contribution against Jonas H. Shirey, the accepted pastor, or the trustees, or other officers or employees, acting on its behalf and joined as co-defendants."