SIMS v. GREEN.

No. 6657.

District Court, E. D. Pennsylvania.

July 1, 1947.

Walter Gay, Jr., and Gerald A. Gleeson, both of Philadelphia, Pa., for plaintiff.

Raymond Pace Alexander and C. Russell Phillips, both of Philadelphia, for defendant.

WELSH, District Judge.

The plaintiff and defendant in this action are bishops of the African Methodist Episcopal Church, both of whom are highly respected and much beloved men and leaders in their respective districts. Each seeks to enjoin the other from presiding over conferences of the first Episcopal District of said church.

The question submitted to us presents problems that are not usually presented to a Chancellor in the Civil Courts. In a strictly legal sense the problem may not be unusual yet a Chancellor cannot remain entirely oblivious of the far deeper questions that are raised by the pleadings and the evidence. Those deeper problems do not affect our judicial judgment but they are consciously present and call for the greatest wisdom in making a decision. There is ever present before the Chan·

cellor the thought that while this contest is one involving persons and personalities, the greater question is one that transcends personalities—we refer to the long established philosophies of our courts that must govern us in deciding a question in which the administration and interpretation of the supreme law of the Church is involved. That philosophy must be the pole-star that guides us in mapping our course through such a troubled sea of internal church conflict as has been presented in this case. Therefore, in our reasoning and in our interpretation of facts and theories, and in our conclusions we feel that we should frankly state our adherence to that philosophy.

The African Methodist Episcopal Church is a voluntary association claiming approximately one million communicants throughout the United States and foreign countries. It is divided into seventeen episcopal districts, each of which is presided over by a bishop. The episcopal districts are composed of several annual conferences. The First Episcopal District comprises the Philadelphia, New York, New Jersey, New England, Deleware, Burmuda and the Maritime Conferences. The government of the church is established by its Book of Discipline, which contains all laws and by-laws relating thereto.

The supreme governing authority is the General Conference, which meets every four years. It is composed of bishops, clergymen, laymen, college officials and delegates elected from the episcopal districts. A Bishops Council composed of the bishops presiding over the episcopal districts regulates the affairs of the church and has full supervision during the interim between the General Conferences. The powers granted to the Bishops Council include the hearing of complaints against any of the bishops, and the power to remove or transfer a bishop to or from a district by two-third vote if the good of the church demands it.

The plaintiff has served as bishop of the First Episcopal District since 1940, his last formal assignment being by the General Conference of 1944 and extending to 1948. In June, 1946 the Bishops Council formally determined that a change should be made in the administration of the New York Conference and designated Bishop Wright as associate bishop with full authority to act in that Conference. Although Bishop Sims had subscribed to the resolution making such change, he caused an action to be instituted in the Supreme Court of New York, to enjoin Bishop Wright from assuming full presiding authority in said Conference. Bishop Sims contended that because accusations had been made against him he could not be removed from the Conference except upon trial.

By reason of such controversy the Bishops Council held a special meeting on August 15 at Washington, D. C., for the purpose of clarifying the earlier resolution by expressly describing the extent of Bishop Wright's authority. The meeting failed of its purpose and was adjourned because certain of the bishops sought to withdraw their approval of the resolution previously adopted, and challenged the power of the council to relieve Bishop Sims of jurisdiction in the New York Conference.

Thereafter charges were preferred against Bishop Sims accusing him of rebellion against the Bishops Council, maladministration and other offences. The charges were served upon him on September 15 and a trial committee was appointed to hear the charges on September 25. On that date the trial committee convened but was prevented from proceeding by the boisterous conduct of persons in attendance, whereupon the committee adjourned to another place. Before the trial committee could proceed it was temporarily restrained by an order of court obtained upon complaint of parties favoring Bishop Sims in the controversy. Ecclesiastical charges were also preferred by Bishop Sims' group against nine of the bishops opposed to them.

The restraining order precluding the trial of Bishop Sims in New York on September 25 was dissolved and the trial committee sought to change its venue, fixing October 22 and Cincinnati as the time and place for its hearing. Just prior to that date Bishop Sims obtained a restraining order from the Federal District Court of Ohio enjoining the trial committee from holding the trial.

On September 23 the Bishops Council held a meeting attended by 15 bishops at which it was proposed that a special session of the General Conference be called to deal with the controversies between the contending factions. The meeting was broken up by a violent disturbance before anything was accomplished, whereupon ten of the bishops adjourned to a hotel where they initiated steps to call a special session of the General Conference.

An extra session of the General Conference was held at Little Rock, Arkansas, November 20 to 23. The actions taken included the trial and conviction of Bishop Sims and his dismissal from the bishopric of the church. Thereafter the Bishops Council replaced him in conference of the First Episcopal District by appointing Bishop Green to such district.

The principal question raised by the pleadings and the evidence is whether the plaintiff was legally unfrocked as a Bishop, and the defendant assigned as his successor in the First Episcopal District. The answer to that question is dependent upon a determination as to the legal propriety of the extra session of the General Conference, whether the church judicatories were constituted and functioned in accordance with the rules of the Discipline, and whether the plaintiff was provided with proper notice and an opportunity to defend his position.

We are not concerned with the controversies and litigation between the contesting parties prior to the steps taken to call the extra session of the General Conference, except to recognize them as evidence of serious disputes within the church and of the necessity for some affirmative action by the church leaders. The open differences then existing between the factions of the bishops group involved interpretation of provisions of the Discipline and of the powers and functions of the Bishops Council. The minority group opposed the construction of the church law and the proposed actions of the majority group because they adversely affected the interests of the minority. None of the disputes concerned spiritual or doctrinal matters.

One of the leading cases on this subject is that of Krecker v. Shirey, 163 Pa. 534, 546, 555, 30 A. 440, 29 L.R.A. 476, wherein Mr. Justice Williams after declaring the principles that should govern the civil courts in a church dispute, used the following language: "The conduct of the parties and their sympathizers on both sides seems to have been hasty, uncharitable, and ill-tempered. It affords a travesty, rather than an illustration, of the precepts of the religion of peace for the support and diffusion of which the church was organized and the parties on both sides profess to have devoted their energies and their lives. But our concern is with the legal aspects of the case presented to us, and to them we turn, leaving the moral side of the controversy to the consciences of the combatants."

Whether there is a parallelism between the facts as above outlined and whether the language of Mr. Justice Williams in that case is applicable here, I leave to the Christian conscience of the clerical and lay members of the great Church that is involved in this unfortunate controversy.

We are concerned here with the controversies over the call of the extra session of the General Conference and the propriety of its procedure. But before analyzing the issues it is important to recognize that the differences between the factions of the bishops groups and their followers had affected the affairs of the church in certain sections and precluded the church authorities, the Bishops Council especially, from effectively performing their normal functions. Bitterness had arisen. The majority deemed the minority a rebellious group and the minority believed that the majority sought autocratic power and the destruction of Bishop Sims' position and influence in the First Episcopal District. The majority was in the stronger position to apply the church law according to its interpretation and to accomplish its objectives by the weight of numbers; and the minority was thus impelled to resist and defend by challenging the legal propriety of the actions taken by the majority. Charges and countercharges intensified the conflict and, whether made in good faith or not, they were of strategic importance in the contest between the factions.

Both sides contributed appreciably to the struggle, and the actions of neither side were prompted entirely by an unselfish zeal for the welfare of the church or the accomplishment of its Christian purposes. We are inclined to believe however that since the contest had developed and the issues had become complicated to the point where resort was had to the civil courts, the majority of the church leaders were justified in the opinion that nothing short of the action of the supreme church authority could effectively handle the problems. The steps taken by the majority with the view to calling an Extra Session of the General Conference, the call, the proceedings of the Conference, and the expulsion of Bishop Sims, are challenged by the plaintiff and his group on the general·grounds of legal inadequacy and impropriety. It therefore becomes necessary to examine the contentions of the respective parties with respect to the conference procedure and to determine the duty of this court.

It has been determined that the pleadings in this case present a justiciable controversy as to whether the plaintiff was legally installed and later expelled as a bishop, and the defendant legally appointed in his place, under the laws of Pennsylvania; and that this court has jurisdiction by reason of the diversity of citizenship of the parties. Sims v. Green, 3 Cir., 160 F.2d 512. The present inquiry is confined to the ascertainment of the pertinent church law and the determination of whether such law has been construed and complied with by proper church tribunals.

■ The A.M.E. Discipline, like other constitutions, codes and regulations contains some uncertainties, ambiguities and inadequacies as to details, and it may be expected that church tribunals untrained in legal philosophy may arrive at conclusions at variance with those which a court of law might reach. But if the church law has been construed and applied reasonably by the church itself, a different construction or application by the civil courts could not be justified upon any theory which recognizes the essential principle of the separation of church and state.

The first irregularity charged is that the majority of the bishops, assuming that the senior bishop was disqualified from presiding over the council by charges against him, chose the next in seniority, Bishop Ransome, to act in his stead in arranging for the extra session. Plaintiff contends that the pending charges only precluded the senior bishop from appointing or sitting on his own trial committee, and that he was therefore the presiding officer of the council; only a legally constituted Bishops Council could propose an extra session of the General Conference, and since the moving bishops did not constitute a Bishops Council, they were without authority to propose a special conference. In support of this contention the plaintiff cites Section 172 of the Discipline granting to the Bishops Council full supervision over the entire church during the interim of the General Conference.

The defendant's position is that by reason of the existing circumstances the Bishops Council was unable to hold formal meetings or to function effectively because of the hopeless division between the factions, that necessity induced the majority group to initiate the required steps to call the conference, and that the general power of supervision given to the council did not preclude the majority of the bishops from proposing such a conference.

■ The Discipline authorizes extra sessions of the General Conference and presumably intended that they be proposed by the incumbent senior bishop or the bishops council as the ruling church authorities. The circumstances however precluded them from taking such action and of necessity the proposal as issued by ten of the bishops was a practical expedient. We do not find that their course of conduct is in conflict with either the provisions or the spirit of the Discipline and find no patent irregularity in the proposal and invitation issued. The collateral question as to whether the senior bishop was disqualified by the pending charges is therefore immaterial.

Plaintiff contends that since the Discipline requires the call for an extra session of the General Conference to be advised and approved by two-thirds of the

annual conferences; such approval could only be given by the annual conferences in their regular annual sessions, and not by special sessions called for such purpose; and further that the special sessions held could not be deemed annual conferences in that they did not transact the business prescribed as the order of business by the Discipline. He relies on the fact that the Discipline expressly provides for special annual conferences for the single purpose of electing delegates to an extra session of the General Conference, and deems mandatory the provision that the annual conferences transact certain business, in order to constitute itself an annual conference. The defendant urges that special sessions of annual conferences are customary and traditional, that the authorization of special sessions for the single purpose designated by the Discipline implies authority for such sessions for all practical purposes, and that the Discipline does not prohibit special annual conferences at any time or place, nor render them invalid for failure to transact all of the business within their authorized scope.

■■ The contention that special sessions of the annual conferences were illegal because they are not authorized by the Discipline and because they failed to transact all of the business prescribed would, if sustained, require a strained and unnatural interpretation of the law of the church, and we decline to adopt it. The authorization of the special sessions of the Annual Conferences for a specified purpose neither expressly nor by inference precludes the holding of special sessions for other necessary purposes, and the custom of this and like organizations confirms the legal propriety of such special sessions. Nor do we believe that the Discipline by prescribing the order of business renders void those special sessions which fail to formally proceed according to the outline stated for the annual conferences.

The returns of approval by the annual conferences are challenged by the plaintiff on the grounds that they were made to an irregular and unconstituted authority, that they were informal and defective, and were so burdened with discrepancies as to create doubt as to their propriety and authenticity. He urges that the burden of proving the propriety of the action of two-thirds of the one hundred and eleven annual conferences is upon the defendant and unless it is affirmatively shown that the eighty-six approving conferences actually and formally approved and made proper report thereof, the call and the subsequent conference were of no effect. The defendant differs from the plaintiff over the burden of proof, and points out that the reports of approval of the annual conferences were verified by a committee of five of the majority group of bishops and by the Credentials Committee of the conference, and that the Discipline is silent as to the method to be used in determining the fact of the two-thirds approval.

■ The approval of the call by two-thirds of the annual conferences is a question of fact. There is no provision in the Discipline as to how or to whom the returns of approval shall be made, nor is any special tribunal designated to determine their authenticity. These matters are obviously left to the judgment and integrity of the incumbent administrators of the church affairs, subject however to the approval of church judicatories acting within the scope of their authority. Having concluded that the ten bishops were justified in inviting approval of the annual conferences, it is not unreasonable to conclude that the returns of the annual conferences might, with equal propriety and in the absence of disciplinary direction, be made to the source of that invitation, subject of course to official count and verification. The evidence in support of approval, consisting of formal and informal resolutions, letters and telegrams, was sufficient to convince a committee of the bishops and later the Credentials Committee of the General Conference that two-thirds had in fact advised and approved the call for an extra session. No substantial evidence to the contrary was offered at the trial. We do not believe it is the duty of the court to examine into the place or procedure of the special sessions of the annual conferences nor to undertake to count and verify the authenticity of the returns. Any doubt as to such matters by reason of discrepancies and informality must more

properly be left to those bodies responsible for the enforcement of the church law.

Considerable emphasis is placed by the plaintiff on the contention that the call for the Extra Session was made by ten of the bishops acting without the authority of the Discipline, and that by reason thereof the call and the actions taken at the Conference were illegal and wholly void. The basis of this contention is that the language of Section 162 of the Discipline authorizing "The Bishops, with the advice of two-thirds of the Annual Conferences", to call an Extra Session must be construed to mean "all" of the bishops and not merely a majority or quorum. The defendant replies that there is nothing in the Discipline requiring the bishops to act unanimously or as a council in issuing such a call, the functions of the Bishops Council as outlined in the Discipline (Sections 168-176) are silent as to the calling of extra sessions, and the issuance of the call by ten of the bishops was a mere ministerial act since two-thirds of the annual conferences had advised it.

Plaintiff argued that the implied purpose of the call was to penalize the minority and especially to remove Bishop Sims, that such action required two-thirds vote of the Bishops Council, and that since such a majority had not issued the call it was fatally defective. He declared that the call was illegal, in that the agenda of the proposed conference was not published until after some of the annual conferences had authorized the extra session, that no necessity existed therefor, and also because of the inadequacy of the distribution of the call due to errors and omissions in the lists of delegates, especially with regard to the foreign territories and the districts supervised by the dissenting bishops. He maintains generally that in the absence of proof of accurate and universal notice, and because of the existence of discrepancies in the lists used, the inference must be that the conference was packed and therefore illegal.

Defendant believes that none of such arguments are supported by the Discipline or the evidence, and he points out that there was a full disclosure of the purposes in the communications and the call,

an actual necessity existed, and that every effort had been made to effectively notify all parties notwithstanding the absence of a central directory and the failure of dissenting bishops to disseminate the call.

The narrow construction placed by the plaintiff upon Section 162 authorizing "the bishops" to call the extra session is not justified by the language used or the practical purpose to be served. The term might possibly be construed to mean the Bishops Council, a majority of the bishops as a group or as a council, or as urged by the plaintiff "all" of the bishops or at least two-thirds thereof with the assumption that the purpose was to remove the plaintiff from his district. In the absence of any specific provision or of any impelling inference to the contrary we are inclined to believe that the authorization to "the bishops with the advice of two-thirds of the annual conferences" was justifiably exercised by the ten bishops who issued the call, and especially so since the call was a ministerial act done in compliance with the advice of two-thirds of the annual conferences. Nor are we convinced that the call was illegal and void because the agenda was not publicized in a timely manner or because of errors and omissions in the lists of delegates and the distribution of notice to foreign territories and districts of dissenting bishops. The fact is that both the controversies and the call were given wide distribution throughout the church. All reasonable efforts were exercised to make known to the proper parties the necessity for the extra session and the call thereof in compliance with the Discipline. There being no central registry some of the burden of disseminating the call fell upon the bishops. The failure of those dissenting to do so and the existence of discrepancies did not preclude eleven hundred communicants of the church from assembling, and we are satisfied with the judgment of the conference that the call was adequate and universal.

As to the conference itself, the plaintiff claims that it was illegally organized in that it elected a new chief secretary and designated committees, whereas it should have continued in office the committees and officers of the 1944 Conference. The de-

fendant, the majority group, and the conference itself deemed the Extra Session to be a new General Conference and acted on the assumption that it was subject to the rules and should follow the usual procedure of General Conferences. The fact is that the Discipline is silent as to the procedure for an Extra Session and no precedent is available in as much as the Extra Session was the first in the one hundred and fifty years' life of the church.

■ The conduct of an extra session is not affirmatively prescribed by the Discipline, and whether the Little Rock conference was justified in electing a new general secretary and forming new Credentials and Episcopal Committees was open for the dispute which developed. No precedent is available. We decline to hold with the plaintiff that the officers and committees of the 1944 conference must continue in office in order to constitute the conference a legal one and its actions valid. This appears to be a question exclusively for the church authorities.

Bishop Sims denies that he received notice of his trial at the conference, the denial being in the sense that he did not receive the thirty days' formal notice prescribed by the Discipline. There can be no doubt however that he had actual notice, and there is evidence that notice and the charges were served upon him forty-three days in advance of the conference, although not by the President or Secretary of the Bishops Council. Defendant denies the necessity of the formal notice prescribed by the Discipline for the trial of bishops, in as much as the expulsion of Bishop Sims was by the action of the conference on the recommendation of the Episcopal Committee, and points to Bishop Sims' acknowledgement of notice of his impending trial and his efforts to preclude it as evidence of the opportunity to appear and defend and to appeal to the conference.

■ The plaintiff concludes that he received no notice of his trial at the extra session notwithstanding evidence to the contrary and his own acknowledgement that the trial was to be had. While it is true that the Discipline requires thirty days' notice to be given by the President or Secretary of the Bishops Council when a trial is to be had before a trial Committee in the interim between general conferences, it is not clear that such formality is required where charges or complaints are considered by the Episcopal Committee at a General Conference. It is certain however that the actions of the trial committee would be limited to prescribing suspension and that final expulsion could in any event only be decreed by a General Conference. The question of whether the formal thirty days' notice was necessary and whether it was in fact given are technical ones involving an interpretation of the Discipline, and in the absence of any expressly controlling provision we are not in a position to declare the trial or the examination by the Episcopal Committee void for want of notice or an opportunity to the plaintiff to defend his legal position.

As to the action of the Episcopal and Judiciary Committees as reported by the minutes, and there is nothing in the record to the contrary, we find no serious violation of the Discipline. There can be no doubt of the opportunity of the plaintiff to appear and defend against the charges and to justify his conduct before the Episcopal Committee and the Conference itself. The Bishops Council as constituted under the amendment to the Discipline adopted at the Conference formally assigned the defendant to the plaintiff's Episcopal District. Assuming that the Conference was a legal one and that the amendment was adopted as reported, such action of the council is not subject to question. Although the plaintiff vigorously contests the propriety of the procedure which resulted in his expulsion on technical grounds, it is obvious that the Conference and its promulgators sought to conform to the letter of the law and that they succeeded to the extent that the Conference itself approved of their actions.

It is apparent from this discussion that the points of difference between the parties rest upon conflicting interpretations of the Discipline and that both sides seek to have this court resolve those differences in their respective favors. The plaintiff would also have us examine into the propriety and accuracy of the actions of the

eighty-six annual conferences and the qualifications of the delegates to the conference, and to find as a fact that inaccuracies inevitably involved in so complex a project have rendered void all of the things purported to have been accomplished by the conference.

We do not believe that it is the function of the civil courts to weigh and interpret the provisions of the laws established for the government of a church organization which has jurisdiction to do so for itself. Their duty extends no farther than the determination of the existence of the church law, whether it has been fairly interpreted and applied, and whether there are judicatories which have functioned in practical compliance with the law and within their jurisdiction.

The evidence does not disclose any plain or flagrant violation of the laws of the church in the call or in the conduct of the extra session of the general conference, nor do we find that it was unlawfully packed for the ruthless accomplishment of a preconceived purpose. There is evidence of the necessity for the extra session, of an attempt by the majority of bishops to comply with the letter of the law, adequate notice to all parties concerned, a·large conference of church representatives, and the exercise of the functions of government by the conference within the scope of the law as interpreted by that authority. Our conclusion is a negative one. Sustaining the effectiveness of the extra session is not intended as an encouragement to the dominating element in a church organization to administer its laws for the service of its selfish will or to exercise its power over the minority regardless of justice or the virtue of its cause. Rather it is on the ground that the civil courts must wherever possible avoid interference with church affairs and leave to the church tribunals the determination and application of their own laws.

This conclusion is amply supported by the law of Pennsylvania. Upon questions arising under the Discipline, as upon those arising under the articles of faith, the decisions and the actions of the ecclesiastical tribunals are ordinarily final, and they will be respected by courts of law. German Reformed Church v. Seibert, 3 Pa. 282; Schlichter v. Keiter, 156 Pa. 119, 27 A. 45, 22 L.R.A. 161. But if the decisions plainly violate the law they profess to administer or are in conflict with the laws of the land they will not be followed.

The regularity and legal effect of the organization of a General Conference in the manner in which it was accomplished, raises an ecclesiastical question. Its determination depends upon an interpretation of the provisions of the Discipline which it is the duty of the General Conference to make. If the decision actually made does not violate the laws of the state or the church, and is conclusive upon the ecclesiastical body of which the General Conference is the chief tribunal, it should be followed by the civil courts. Whether the General Conference disposed of the questions in the wisest manner or with legalistic exactitude are not to be considered. Its decisions and interpretations settle the law and its applications and the civil courts must recognize its effectiveness. Krecker v. Shirey, 163 Pa. 534, 30 A. 440, 29 L.R.A. 476.

A majority of a church organization may direct and control church matters consistently with the laws of the church but not in violation of them. Long v. Harvey, 177 Pa. 473, 35 A. 869, 34 L.R.A. 169, 55 Am.St.Rep. 733. If the acts of the majority are justified and adopted by the supreme church tribunal they may not be deemed unlawful even though they result in the removal of an official and the incidental loss of his emoluments. Furmanski v. Iwanowski, 265 Pa. 1, 108 A. 27. Civil courts do not review the merits of a decision rendered in an ecclesiastical matter by the appropriate church tribunal. Post v. Dougherty, 326 Pa. 97, 102, 191 A. 151.

We have tried to set out the legal principles that have been laid down by our courts in a controversy of this kind. We have refrained from going beyond the applicable legal principles involved. By refraining from doing so we are not unmindful of some very important questions that may perhaps require reference to if not

commented upon by us. Nor are we unmindful of the fact that the legal principles upon which we rely have left untouched in this opinion the question of the security of the tenure of office of the bishops of the African Methodist Episcopal Church under the Discipline. We could not help but be impressed by the almost absolute control of the Bishops with respect to the Special Conferences held in their jurisdictions. This was evidenced by the almost unanimous votes in many of the conferences; the speed with which some of these so-called trials were conducted cannot help but raise a question in the mind of the Chancellor. The question of the probability or possibility of a trial in the civil sense or meaning of the word at the Extra Session quite naturally was injected into the picture as was the question of the right of actual appeal on the part of those who were called upon to face trial. These questions if raised in a civil or political organization would be judged by the democratic theories governing such organizations and the procedure that should prevail. The plaintiff claimed that with respect to many of the above matters the defendant resorted to what the outside world calls "steamroller" tactics. However, this being entirely an ecclesiastical matter, set up and operated by ecclesiastical authorities, the civil courts are loath to impugn Christian leadership even though the court might feel that the actions savor somewhat of worldly weaknesses, if the reasonable letter of the governing law has been observed. In other words, we feel that it would be highly dangerous to substitute for the judgment and opinion of the ecclesiastical authorities the judgment of a civil court unless both letter and spirit of the governing law had been practically ignored. This is especially true today because we cannot close our eyes to the fact that all over the world, on all continents there is great conflict raging along the economic and political front. History teaches us that when such conflicts rage in the breast of humanity, even the Church is drawn into the conflict. When the church is so drawn into that conflict, it must act under its own laws and be responsible to its membership unless the supreme law of the land governing its actions has not been transgressed. A breaking down of this principle of law will result in the civil courts ruling the church rather than the church being ruled by duly constituted ecclesiastical bodies.

Whatever the cause of this schism we can say that the effect has been tragic. Such bitterness is not often presented to us in a court of law. We do take pleasure however in saying that lest this unfortunate affair be seized upon by the scoffer and be prejudicial and damaging to the whole church and the entire group, that there is nothing as far as we have been able to ascertain in any of these charges that reflects upon the personal honesty and morality of the persons involved. No moral stigma has attached to any one and it is a church dispute in which personal rivalries, ambitions and rival purposes have blended to make a warfare that if persisted in can only destroy the organization of the church and its great Spiritual influences on millions throughout the world.

From the evidence submitted, we make the following

### Findings of Fact.

1. The plaintiff David H. Sims is a citizen of the State of Pennsylvania; the defendant S. L. Green is a citizen of the State of Arkansas; and the amount in controversy exceeds $3,000.

2. The plaintiff David H. Sims is a Bishop of the African Methodist Episcopal Church, and was assigned in 1944 by the General Conference of said Church to the First Episcopal District thereof for a tenure extending until May, 1948.

3. The First Episcopal District of the African Methodist Episcopal Church consists of the following Conferences: Philadelphia, New Jersey, New York, New England, Delaware, Bermuda and Maritime Conferences.

4. The plaintiff receives from the African Methodist Episcopal Church as salary and other emoluments of office, a sum in excess of $3,000 annually, and by virtue of his office is the President of the Board of Managers of the property and business of the Book Concern of said Church located in Philadelphia.

5. By virtue of such assignment the plaintiff took charge of the affairs of the African Methodist Episcopal Church within the First Episcopal District with authority to assign ministers and other officials and to supervise the annual conferences in said district. Such authority continued up to the time of the controversies upon which this suit is based.

6. On or about December 4, 1946 the defendant, a bishop of the African Methodist Episcopal Church assigned as presiding bishop of the Philadelphia, Delaware and Maritime Conferences of the First Episcopal District, by virtue of an extra session of the General Conference of said church held on November 20, 1946, sought to interfere with the administration of the affairs of the African Methodist Episcopal Church in said conferences and the supervision thereof by the plaintiff, by giving general notice to the pastors and communicants thereof of his assignment and by giving notice of the calling of a special session of the Philadelphia Annual Conference. By reason of such actions the plaintiff instituted the present suit.

7. The laws and regulations of the African Methodist Episcopal Church which govern and control the authority and functions of the General Conference, the Annual Conference and all other affairs of the Church consist of the A.M.E. Discipline.

8. The Discipline provides:

"1. The bishops with the advice of two-thirds of the Annual Conferences, when necessary, shall call an extra session of the General Conference."

"2. The bishops * * * shall, in writing, notify the preachers in charge of circuits and stations to inform all delegates in good standing, as members of the last quadrennial session, to attend the extra session at the time and place appointed by the bishops. * * * After notice being thus duly given, if two-thirds of the delegates be present at the appointed time and place, they shall proceed to business and their proceedings shall be lawful."

9. The Bishops Council was on and prior to September 23, unable to properly administer the affairs of the church by reason of the existence of controversies and litigation between opposing factions of the members of the council. The faction of which Bishop Green is a representative included the ten bishops who deemed it necessary to call an extra session of the General Conference to deal with the problems then pending. They were opposed by six bishops of whom Bishop Sims is a representative.

10. On October 5 ten of the bishops issued a communication addressed to the ministers and members of the church and the members of the various Annual Conferences reciting the existence of deplorable and unsavory conditions in the church and the necessity for an extra session of the General Conference to deal therewith, and proclaiming that the annual conferences should be called to authorize a special session for the purpose of hearing, considering and acting upon a report of the bishops to the Episcopal Committee in reference to the matters recited in the communication. This was disseminated to the church through the bishops and by publication in the official church press.

11. On October 22 an additional special communication was issued by the same ten bishops specifically charging Bishop Sims with openly and flagrantly ignoring the Discipline and with disrespect for an open rebellion against the laws, doctrines and government of the church; and suspending and referring to the special session the trial of Bishop Sims then pending. The communications were published in the official church press and a response thereto by Bishop Sims was published in the same issue.

12. The Annual Conferences of the Episcopal Districts acted upon the request made in the communication of October 5 and reported their actions to the bishops. Bishops Clayton, Baber, Wright, Green and Reid examined the returns of the Annual Conferences and determined that $\frac{2}{3}$ thereof had approved and advised the call of the extra session.

13. On November 5 ten of the bishops issued a call for an extra session of the General Conference to be held at Little Rock, Arkansas November 20-24, requiring all members and delegates of the 1944 Con-

ference to attend, directing all pastors to notify the delegates, declaring that the purpose of the session was, inter alia, to hear and act upon a report of the bishops on matters referred to in the special communications of October 5 and October 22 previously recited, and proclaiming that the Conference was called in compliance with the requirements of the Discipline.

14. Bishop Sims notified the elders of the First Episcopal District that said District was not participating in the Conference, that it had been called illegally, and expressly for the purpose of trying him upon charges on which he had been previously exonerated.

15. Prior to the date fixed for the Conference, the ten bishops who had issued the call started suit in the United States District Court for the Eastern District of Arkansas to restrain the plaintiff and the minority group from interfering with the conduct of the conference. The defendants therein answered the complaint alleging illegality in the call of the conference, and asking that it be restrained from proceeding to a trial of Bishop Sims on charges on which he had been acquitted by an ecclesiastical court. After hearings on November 18 and 19, the suit was terminated by a stipulation of all parties that "all court action on both sides with reference to the holding of the General Conference will be dropped, and that we proceed with the extra session of the General Conference."

16. Pursuant to the call, the Conference was attended by the bishops of the church, and approximately 1,100 ministers, officials, delegates and other members of the church. Plaintiff appeared at the first session but denied attendance in his official capacity.

17. The proceedings at said Conference included the calling of the roll of delegates, the election of a Chief Secretary, and the appointment of a Credentials Committee. The latter committee by formal report determined that 85 of the Annual Conferences had approved the call of the extra sessions and 26 had failed to report, and also that a quorum consisting of 2/3 of the qualified delegates were in attendance, which report was adopted by the Conference.

18. At said Conference the Episcopal Committee organized. Charges against Bishop Sims were presented to it. The Episcopal Committee appointed a Judicial Committee to hear the charges against Bishop Sims. The Judicial Committee, after attempting to summon Bishop Sims to the hearing without success, and upon notice to his counsel, proceeded to hear evidence in support of the charges against him.

19. The charges upon which the trial was had were served upon the plaintiff on September 15, together with a notice to appear for trial September 25, which proposed trial was enjoined through legal proceedings instituted by or on behalf of the plaintiff; and again on October 8, together with notice that the plaintiff would be tried at the extra session of the General Conference. Bishop Sims acknowledged that he knew of the proposed trial at the extra session by his letter to the elders on November 14, advising them that the extra session was called illegally for the express purpose of trying him on charges which were heard on September 25, and by his acknowledgment in the answer filed in the District Court of Arkansas to the same effect.

20. Bishop Sims did not attend the trial before the Judical Committee in person or by his attorney. The Committee at the close of its hearing reported to the Episcopal Committee a finding of guilty against Bishop Sims and recommended his expulsion as a bishop of the church. The Episcopal Committee considered said report and unanimously approved the recommendation therein. The Episcopal Committee prepared and submitted its report to the extra session on November 21, making like recommendation.

21. The members and delegates constituting the extra session voted upon the question of approval or disapproval of the recommendation of the Episcopal Committee. A standing vote was taken by districts, counted by the Secretary and reported to Bishop Gregg, who was then presiding. The vote was 999 in favor of expulsion and 35 opposed.

22. Although the plaintiff did not appear before the conference, the right to appear and to appeal to the extra session

of the General Conference was available to him. Appeals were made by other bishops similarly tried at said Conference, and consideration was given to such appeals by the Conference.

23. Following the extra session of the General Conference, the Bishops Council assigned the defendant to preside over the Philadelphia, Delaware and Maritime Conferences of the First Episcopal District and Bishop Wright to the remaining Conferences in said District.

In order to complete the record the following answers are made to the requests of the parties for findings of fact.

Plaintiff's requests are affirmed with the exception of Nos. 16, 32, 34, 35, 36, 37, 56 and 58 which are deemed to be immaterial; 25, 26, 39, 52, 55, 57 and 59 are refused as stated and 41-49 are refused as being at variance with the forgoing findings.

Defendant's requests are affirmed with the exception of Nos. 27, 29, 30 and 31 which are refused.

For the reasons stated in our discussion, we reach the following

### Conclusions of Law.

1. This court has jurisdiction of the issues presented in this case by reason of diversity of citizenship of the parties.

2. The call of the Extra Session of the General Conference of the Church has not been shown to be in violation of the requirements of the Discipline.

3. The meeting of communicants and officials of the Church at Little Rock, Arkansas on November 20-23, 1946, constituted an Extra Session of the General Conference of the Church.

4. The conduct of the Extra Session was in conformity with the laws of the church as interpreted and applied by the supreme church authorities, and was not in violation of the laws of Pennsylvania.

5. The actions adopted by said conference included the expulsion of the plaintiff as a bishop of the church, and the amendment of the Discipline to permit the election of a president of the Bishops Council in place of the senior bishop.

6. The conduct of the trial of the plaintiff by the Judiciary Committee and the subsequent approval and adoption of its recommendations by the Episcopal Committee and the General Conference was not in violation of any express provisions of the Discipline.

7. The plaintiff had ample notice and opportunity to appear for trial before the Judiciary Committee and to appeal to the General Conference.

8. The defendant was assigned to the Philadelphia, Delaware and Maritime Conferences of the First Episcopal District by the Bishops Council.

9. The Bill of complaint should be dismissed.

10. No necessity has been shown for the granting of the injunction prayed for by the defendant and the prayer is dismissed.

11. The costs of the respective parties to this proceeding should be borne by them.

12. A decree may be entered in accordance herewith.

The requests of the parties for conclusions of law are disposed of as follows:

Plaintiff's requests are refused. Defendant's requests are affirmed with the exception of Nos. 6, 9, 10, 11, 14, 15, 18, 19, 26, 27, 30, 31, 41, 42, which are refused as to the language used or as being at variance with the conclusions above stated.